HAMLIN, Justice.
The defendants appeal from a judgment of the district court annulling and setting aside Order No. 8373 of the Louisiana Public Service Commission and authorizing The Texas & Pacific Railway Company to immediately close and discontinue the operations of its Palmetto, Louisiana, Agency Station. (Art. VI, Sec. 5, La.Const. of 1921, LSA) They aver that the trial judge erred:
(1) In holding that the evidence did not support the Public Service Commission’s finding that the agency at Palmetto, Louisiana, should not be discontinued.
(2) In holding that public convenience and necessity did not require the continued operation of the Palmetto, Louisiana, Agency Station.
Palmetto, a small village with a population of approximately four hundred people in the area, in a rural and agricultural community, is located in St. Landry Parish, Louisiana, between Melville (10.1 miles east) and Rosa (5.7 miles west),[1] at both of *386 which, towns agency stations are maintained and operated by The Texas & Pacific Railway Company (hereinafter designated as the Railroad).
Palmetto is connected with the Melville and Rosa Stations by a hard-surfaced, all-weather State Highway, giving close and convenient access to these stations to any shipper or receiver of freight of the Palmetto Community. It has adequate telephone service to these two stations immediately on its east and west. It is served with regular “less than carload lots” motor freight trucks operated by the Texas and Pacific Motor Transport Company, an auxiliary freight service owned and operated by the Railroad, and it is also served by other motor freight carriers certificated by the Louisiana Public Service Commission (hereinafter designated as the Commis: sion).[2]
The Railroad filed application with the Commission for authority to close and discontinue its agency station at Palmetto, and at a hearing before the Commission Mr. S. L. Wright, Assistant to the President of the Railroad, testified in detail as to the content and authenticity of exhibits setting forth the revenues and expenses of the Palmetto Station for the years 1959 and 1960. These statements reflect a total freight revenue of $15,996.25 for the year 1959 and a total revenue of $16,353.57 for the same period. After subtraction of revenue assignable to either origin or destination and expenses, the loss incurred on traffic to and from Palmetto for 1959 was $4,414.44. The total freight revenue for 1960 was $4,577.37, and the loss incurred on traffic to and from Palmetto for the period was $5,330.18.
Mr. Wright’s testimony was replete as to the serious condition in which his company found itself. He stated that the overall profit on the company’s investment was lj^ths percent, and that the prospects for the future were not favorable; that the company contemplated closing its agency stations wherever public convenience and necessity did not require their remaining open. He further stated that employing the company’s costs ratio, a profit had not been made at Palmetto for the last twenty years.
When questioned as to the manner in which the Palmetto Station had been maintained and as to how it had secured its revenue during bad crop years, Mr. Wright made the following statement:
“ * * * we got everything that moved into the Town of Palmetto; we got everything in and out; there were no truck lines; there was nothing but wagons and wagons did not move anything between towns or for long distances. With the coming of the truck and with the coming of the motor carrier and the private carrier the people have left the railroads. We’ve got the best railroad we’ve ever had at Palmetto ; we’ve got better tracks; we’ve got better service; the tracks are better-maintained; we’ve got better passenger trains; we’ve got air-conditioned trains whereas 25 years ago there was not room to get on them and they were hot and dirty with flies. They have left us for the private automobile and there’s no chance to go back and increase the business.”
Mr. Wright testified that since Palmetto was a flag-stop there would be no change in the passenger service if the station were *387 discontinued; that in the future passengers would buy their tickets on the train instead of from an agent. He said that the “less than carload lots” shipments would not be handled differently; that they would be picked up and delivered by truck line at the stores and even at the residences; that the accounting would be shifted from Palmetto, but that the service would be maintained. As to the method of operation if the application were granted, Mr. Wright stated:
“Carload and LCL [less than carload lots] shipments will be handled as at present. No change in either freight or passenger schedules is contemplated. There being a telephone in our Melville station, and since both Palmetto and Melville are on the same telephone exchange (thus involving no tolls), our agent at Melville will be able to assume the handling of traffic for both stations with no difficulty. In such instances where a shipper or receiver would have occasion to contact our agents either at Bunkie or Opelousas, collect calls pertaining to railroad business will be accepted at either point.”
Approximately nineteen persons testified with respect to the desirability of having the Palmetto Station remain open. Since appellants have pointed out this circumstance to illustrate the fact that such a large number of witnesses appearing at a discontinuance hearing tends to indicate that the closing of the station will be detrimental to the public convenience and necessity, we feel constrained to summarize the testimony of these witnesses.
Senator Frank Diesi, State Representative Sidney Sylvester, State Representative Steven Dupuis, and State Representátive Alton Durand appeared as public officials; they are not shippers nor receivers.
Jack Beard, Alderman and Mayor-Pro tern of Palmetto, testifed that he is not a shipper, but “we get gravel through the Railroad for the town.” He is a foreman for the Peoples Moss Gin, which he stated, ships over the Railroad; he did not testify to. what extent. He stated that Palmetto has been in a disaster area for about two or three years, due to bad crops, and that there would be more business for the Railroad in the future than there had been in the last two or three years. He also testified “you have to wait an hour or two hours to use that ’phone.” He admitted that in 1960 the crops were “pretty good.”
Johnny A. Haas, Jr., President of the St. Landry Parish Police Jury, testified that the part of St. Landry Parish where Palmetto is located has been designated by the Federal Government as a disaster area “on account of crop failures, weather conditions and so forth,” for the past three years. He said that the cattle industry “and other things” were affected. He lives in Opelou-sas and does not do any shipping out of Palmetto; he did not testify that he receives any shipments at Palmetto.
Jess Bernard, a resident of Palmetto, in the moss, cotton and store business, ships moss and cotton, primarily, over the Railroad ; he complained that he would have to go to Melville to bill out the car or else call up on an 8-party line and wait for the depot agent at Melville to mail the bill of lading to him. He commented on the cotton situation as follows:
“ * * * We have had a very sharp reduction in our ginning in Palmetto during the last three years, starting with the year 1957.
“Our volume was cut to about 50% of normal in ’57, decreased below that in ’58 and came back up to about 50% in ’59. In 1960 we had a very good year; we ginned approximately 3,000 bales of cotton. Earlier, Mr. Wright said that 75 bales were loaded to the car, I believe, but actually, in Palmetto, we can only load 32 to 33 bales to the car and that makes close to 100 carloads of cotton.
*388 “Up until 1959 I bought every bale of cotton that was ginned in town that I know of and shipped it by T. & P. Railroad.
“During the year 1959 the Federal Purchase Program (now this is not the Loan Program) this is the actual C. C. C. Purchase Program went into effect. Our farmers are all quite small and' if they don’t sell a bale of cotton today they don’t eat tomorrow sometimes and they want their money when they gin it, and we furnish that kind of service of actually being able to give them a check as they gin their bale.
“During 1959 when the C. C. C. started purchasing cotton we went along with the program to a very small extent and in order to get the farmers their money within a day or two of the time that they ginned, we had to track the cotton to the compress in Alexandria, the very same compress, no difference there, and get the compress receipt, bring it back at which time the Government authorized us to pay the farmer a check drawn on the Government.
“During 1960 virtually all of the cotton went this way to the compress direct by truck and we’ve had trucks for all these years but we’ve never chose to use them to haul baled cotton before. We always let that go by rail, but what could we do? Because in ’59 we found that when we shipped by rail that it was two weeks before the farmer got his compress receipt and he could get pretty hungry in that time.
“Now, this program has gone out for 1961 and in all cotton, as I understand it, will definitely go by rail again. There’s no other gins there; there’s no other buyers; there’s no one that I know of that would favor shipping by trucks and certainly we wouldn’t.
“I might also add at this point that our Ward has applied for more cotton in St. Landry Parish than any other Ward and the people have indicated the trend toward cotton, whereas the southern half of the parish went toward potatoes. We’re going definitely back into cotton and I think there’ll be a sharp increase in it.
“In the moss we have found a new use for moss. Our 1960 shipments were upped 11,000 pounds over 1959, and ’59 was about the same as ’58, but there has been a reduction in carload shipments and an increase in L. C. L. shipments in moss and due to the use we’ve discovered, we feel that we are going to do more business. To indicate our confidence in it, our actual production was about 40% more in ’60 than in ’59 but because of the national situation most companies didn’t care to stockpile this material, and - we stockpiled it ourselves in our own warehouses.”
On cross-examination by Mr. Breazeale, Mr. Bernard testified:
“Q. Now, did you hear Mr. Wright’s testimony that that would not be changed and that the cotton would still be loaded the same way as it has been before?
“A. I don’t see how an agent can load it if she’s not there.
“Q. I know that, you say that you can’t say that but if this agent is gone, his testimony is that it will be loaded the same way as it was before and someone else would be there for the loading of cars?
“A. I don’t believe that you have any other personnel there. You’ve removed your Section Foreman and so forth.
“Q. And if the cotton is loaded for ■ you as it has been loaded before then that’s no longer an objection?
*389 “A. That particular part of it wouldn’t be objectionable but how about my order bills of ladings?
“Q. All right, how many carloads did you ship last year?
“A. I only shipped four or five car-' loads of cotton last year but I might add that the cotton I shipped was ‘b’ cotton, all other cotton that I bought as an individual, not as a Government Purchasing Agent, but as an individual, was shipped by rail even though I do own trucks.
“Q. From where was it shipped? It was shipped from Palmetto?
“A. It was shipped from Palmetto.
“Q. And it was shipped as L. C. L. shipments ?
“A. No, no, it was shipped as carload shipments.
“Q. Well, how many carloads went out in all ?
“A. Four to five carloads and that was all the ‘b’ cotton there was.
“Q. So we’re still just talking about four, so to get your bill of lading it wouldn’t necessitate your going to Melville four times a year if the same average were carried on in the future?
“A. As I said, the Government Purchase Program goes out this year.
“Q. Then the answer to my question is that it would still be that this would necessitate four trips per year if it remained the same?
“A. As it was, yes.”
Frank A. Brewer, a resident of Palmetto, in the building materials business and Lone Star Feed Distributor, testified that he would be inconvenienced because he receives shipments by rail and lots of times he would have to have the agent check the cars as they come in to ascertain damage; that phoning the agent at Melville is "pretty hard to do on an- 8-party line” because lots of times it is busy. He anticipates more business in the future. In I960) he received about six cars. He corroborated the other witnesses as to adverse weather conditions. On cross-examination, Mr. Brewer admitted that if he received shipments without damage in the same way as in 1960, it would be satisfactory. ■ The shipments received in 1960 consisted of plasterboard and lumber.
Herbert Taylor, of the Taylor Brothers Furniture Company of Palmetto, receives and ships over the Railroad. He testified as follows:
“ * * * Q. How much freight did you pay in 1960 to The Texas and Pacific Railway Company?
“A. $3,045.54.
“Q. And how many carloads did you receive ?
“A. I don’t know how many carloads I received but it was about five or six — I don’t know.
"Q. What did you ship?
“A. I don’t have any figures on what I shipped but it was very little, I can tell you that.”
On cross-examination by Mr. Breazeale, Mr. Taylor testified:
“Q. Now, Mr. Taylor, do you own any trucks or vans of your own company for the moving of your own goods ?
“A. I do.
“Q. How many do you own, sir ?
“A. I own one bob-tail and one van.
“Q. And do you ship by your own van?
“A. I do.
“Q. All over the state ?
“A. That’s right.
*390 “Q. And of your finished products don’t you haul the majority of your own stuff yourself?
“A. Ido.”
Charles C. Moran, a resident of Palmetto, in the wholesale and retail drug and novelties business and in radio and television, does not ship; he receives less than carload lots shipments. He believes that half of his shipments are received via the Railroad and half via truck. He did not testify as to how many shipments he received. He stated that he had his telephone taken out because it “stayed dead for three weeks.” He testified:—
“Q. So if it was at the depot you couldn’t call at the depot any more than you could call into Melville ?
“A. I am through that town several times a week, generally once or twice a day.”
M. W. Keller, Postmaster at Palmetto and operator of a pharmacy, described his inconvenience as follows:—
“Q. Tell the Commissioners how?
“A. Well, I am also Mail Boy. I carry the mail from the Postoffice to the Depot and, as has been stated here, its a flag-stop, so I go up there with the mail and I go up there about 10 minutes beforehand with the mail and then I go in and ask Mrs. Neal, of course, the Agent, how is the train? Well, sometimes its late and she’s been running pretty late lately, and if its late enough I can go on bade to the place, you know, and do a little work there and do whatever I’ve got to do and come back.
“But he’s talking about the telephones — back to that 8-party telephone. I could get to a telephone across the street, yes, but nine times out of ten I couldn’t get the agent at Melville for possibly 30 or 40 minutes. So its very much an inconvenience and on that particular item.”
Mr. Keller is not a shipper.
As to the telephone service complained of by the foregoing witnesses, the record discloses that the use of telephones by teenagers was mentioned by the Chairman of the Commission. One of the Commissioners suggested, “Maybe the T. & P. people ought to talk to Southern Bell,” after which suggestion, Mr. Wright said, “It looks like the Commission ought to talk to Southern Bell. They’ve got jurisdiction over them.”
Allen Budden, operator of a retail store in Palmetto, receives less than carload lots shipments. He did not testify as to how many.
L. E. Stelly, operator of a business at LeBeau, near Palmetto, receives goods in less than carload lots by railroad, delivered by truck. He did not testify as to how many. (Mr. Wright testified that the deliveries would continue and that the truck would also pick up freight.)
James Savage, Member of the Police Jury of St. Landry Parish, residing at Melville, does not ship through Palmetto, but he receives “some gravel through there every now and then.” He gave no testimony as to inconvenience.
Harry Bihm, a Member of the Town Council of Palmetto, in the automobile garage business, testified: — ■
“Q. Do you receive any goods over the Railroad?
“A. Oh, just a few shipments a year from Alexandria.”
Mr. Bihm gave no further testimony.
Winfred S. Sibille, Principal of Palmetto Pligh School, testified:—
“Q. Do you receive any goods or ship over the Railroad?
“A. We occasionally ship some items and we do occasionally receive some items during the year at various times.”
Mr. Sibille gave no further testimony.
*391 Curtis Macip, Foreman and Ward Constable, testified:—
“Q. Do you get any goods shipped over the Railroad?
“A. Very seldom.”
Mr. Macip gave no further testimony.
Elie LeDoux, after testifying that he lives about two and a half miles from Palmetto, further testified:—
“Q. All right, do you receive or ship goods over the Railroad?
"A. No, sir.”
Mr. LeDoux gave no further testimony.
Addie Ryder, Member of the St. Landry Parish Police Jury, residing between Palmetto and Port Barre, testified:—
“Q. Do you ship any from Palmetto ?
“A. Well, the parish gets some occasionally, like Mr. Savage said, here awhile back quite a few carloads of gravel over there.”
Mr. Ryder also testified:—
“A. I just want to say on behalf of the People of Palmetto in our Ward that I think the station should remain instead of tearing it down. Instead of tearing it down I believe you can build it up.”
Mr. Ryder gave no testimony as to inconvenience.
Thus it appears that those shippers who testified received and sent small, and in some cases inconsequential, shipments via the Railroad.
At the conclusion of the hearing, the Commission denied the Railroad’s application and found:
“The evidence adduced shows that although the station is operating presently at some loss, the agricultural economy of the area, particularly in the production of cotton, has recently been below normal and that there is a distinct prospect in the improvement of the business done at the station. In addition, vigorous opposition was presented by local interests and public officials in the area who testified to the public’s need of the station., and the Commission is of the opinion that the loss being suffered by the railroad in the operation of the Palmetto station does not warrant the discontinuance of the agency in view of its requirement by the public convenience and necessity.”
The trial court held that Order No. 8373 of the Commission was not in accordance with a proper application of the situation at the Palmetto Station and the law as laid down by the courts. It further stated that the Commission failed to apply the facts, as presented to it, to the settled rale in station closing cases as has been repeatedly pronounced by the Supreme Court and which has become a part of our jurisprudence.
The Commission derives its authority from Section 4 of Article 6 of the Constitution of 1921. See, also, LSA-R..S. 45:1165. Its rulings are entitled to great weight and will not be overturned in the absence of a clear showing of abuse of power. S. A. Plarris Transfer & Storage, Inc., et al. v. Louisiana Public Service Commission, et al., 240 La. 1059, 127 So.2d 148; Texas & New Orleans Railroad Co. v. Louisiana Public Service Commission, 241 La. 635, 130 So.2d 398. On the other hand, if the findings and conclusions of the Commission do not conform to the law and are not supported by the evidence — so that the order of the Commission is unreasonable — the court may reverse or vacate such order. Texas & New Orleans Railroad Company v. Louisiana Public Service Commission, et al, 235 La. 973, 106 So.2d 438; Herrin Transportation Company, et al. v. Louisiana Public Service Commission, et al., 241 La. 174, 127 So.2d 541.
*392 In two recent cases in which, the discontinuance of a railroad agency station was at issue, this Court stated:
“ * * * In determining whether a railroad is entitled to close an agency station, the issue is not whether the station has been operated as efficiently as it should have been or whether it would do better if certain improvements were made or a particular service restored but, as we have above stated, whether the public good derived from maintenance of the agency outweighs the expense to the railroad in continuing such agency. * * * » Illinois Central R. Co. v. Louisiana Public Service Commission, 241 La. 1, 127 So.2d 178. See, also, Texas & Pacific Railway Company v. Louisiana Public Service Commission, 240 La. 669, 124 So.2d 902.
“The rule in regard to discontinu-anee of an agency station is a determination of the public convenience and necessity in relation to such service and the expense of the operation as compared with the revenue therefrom. The circumstances which should be considered are the volume of business done at the station, its proximity to other stations, the accessibility thereof, the cost of maintaining such agency station, the financial loss, if any, to the railroad company, due regard for the welfare of the public, and the probabilities of future development. * * * ” Illinois Central Railroad Co. v. Louisiana Public Service Commission et al., 240 La. 769, 125 So.2d 159. See, Texas & New Orleans Railroad Company v. Louisiana Public Service Commission et al., 241 La. 635, 130 So.2d 398; 74 C.J.S. Railroads § 402, p. 962.
With respect to the accounting practices of the Railroad set forth in its exhibits, this Court has held that in the absence of any evidence to the contrary we must adopt the formula of the Railroad in accounting and allocating expenses as the correct one. Texas & New Orleans Railroad Company v. Louisiana Public Service Commission, 241 La. 635, 130 So. 2d 398; Illinois Central Railroad Company v. Louisiana Public Service Commission, 240 La. 769, 125 So.2d 159. We have also held that the probability of future increase in business due to newly developing industries in the area is insufficient to warrant the expense of maintaining an agency station. Texas and Pacific Railway Company v. Louisiana Public Service Commission, 240 La. 669, 124 So.2d 902.
In the present case no contradictory evidence was offered to the accounting practices of the Railroad. The testimony adduced in its behalf and the exhibits offered in evidence showed that it was operating at a loss at the Palmetto Agency Station. From the evidence of the witnesses who testified, it appears that the plaintiff-appellee has carried the burden of showing that the public convenience and necessity would not be materially affected if the station were closed. Under the circumstances of the case, we find that the immediate closure of the Palmetto Agency Station is justified.
For the reasons assigned, the judgment appealed from is affirmed.
SANDERS, J., dissents with written reasons.

. The application of appellee to appellant to close the Palmetto Station alleges that it is 9 miles west of Melville and approximately 7 miles east of Rosa; the petition of appellee filed in the trial court alleges that the Palmetto Station is midway between Melville, which is 9 miles east, and Rosa, which is 7 miles west; the witness for appellee testified that Palmetto is 10.1 miles west of Melville *386 and 5.7 miles east of Rosa; the trial judge found that Melville is 9 miles east and Rosa 7 miles west of Palmetto; ap-pellee’s brief in this Court sets forth that Melville is 9 miles east and Rosa 7 miles west of Palmetto; a map filed in the record shows Melville 10.1 miles east and Rosa 5.7 miles west of Palmetto. Appellants have made no contention with regard to these discrepancies. We accept the distances on the map as being correct.

. The above description is substantially correct and is contained in the “Written Reasons for Judgment” of the trial judge.